UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

STEVEN PENDERGRASS,

    Plaintiff,

  v.

WEXFORD HEALTH SOURCES, INC.,
CORIZON HEALTH, INC. and
DR. AMY GREEN-SIMMS,

    Defendants.

Civil Action No.: TDC-19-1050

**MEMORANDUM OPINION**

Plaintiff Steven Pendergrass, an inmate currently confined at the Maryland Correctional Training Center ("MCTC") in Hagerstown, Maryland, has filed a civil rights action against Defendants Wexford Health Source, Inc. ("Wexford") and Corizon Health, Inc. ("Corizon") asserting a claim under 42 U.S.C. § 1983 for a violation of the Eighth and Fourteenth Amendments to the United States Constitution based on the alleged denial of adequate medical care for an injury to his left eye. Pending before the Court are Defendants' Motion to Dismiss or Alternatively for Summary Judgment; Pendergrass's Cross Motion for Summary Judgment; and Pendergrass's Motion to Add a Defendant, which the Court construes as a Motion to Amend the Complaint. Upon review of the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Pendergrass's Motion to Amend will be GRANTED; Defendants' Motion will be GRANTED; and Pendergrass's Cross Motion for Summary Judgment will be DENIED.

## BACKGROUND

On July 16, 2018, while an inmate at the Brockbridge Correctional Facility ("Brockbridge") in Jessup, Maryland, Pendergrass was attacked by several inmates while he was asleep. During the assault, Pendergrass was struck in the head with locks and stabbed in his face and in the back of his neck. He suffered a "swollen and blood filled left eye" and lacerations to his left cheek, multiple fingers on his left hand, and the back of his neck. Opp'n Mot. Dismiss ("Opp'n") Ex. 1 at 8, ECF No. 17-2. After assessing Pendergrass at the prison's infirmary, the attending nurse determined that his injuries required hospital care. Pendergrass was first sent to Bon Secours Hospital in Baltimore, then to "shock trauma" at the University of Maryland Medical System ("UMMS"). Opp'n at 8, ECF No. 17-1. According to Pendergrass, the primary reason for his transfer to shock trauma was the condition of his left eye.

Pendergrass's eye injury was initially diagnosed as traumatic optic neuropathy with a fracture of the left orbit. He was prescribed Cyclopentolate, medical eyedrops that dilate pupils, for the treatment of his left eye. Pendergrass asserts that he was kept in shock trauma "for more than one night," and that when released he was given "a list of follow ups," which included medical appointments at UMMS two and four weeks later. *Id*. By July 30, 2018, however, while Pendergrass had impaired vision and a collapsed lung, he was transferred from Brockbridge to MCTC. In what Pendergrass characterizes as "a breakdown in communication," a regional representative for Wexford went to Brockbridge on July 30 and learned that Pendergrass had been transferred to MCTC but did not take steps to ensure that he could keep his follow-up medical appointments. Opp'n at 8.

On August 21, 2018, while still at MCTC, Pendergrass submitted a sick call request asking that he receive the follow-up appointments at UMMS. On September 4, 2018, Pendergrass was

transferred to the Dorsey Run Correctional Facility ("DRCF") in Jessup, Maryland. On September 27, 2018, Pendergrass had a medical visit and was told that he would receive an eye examination soon. On October 18, 2018, Pendergrass was sent to UMMS for treatment of the bone fracture in his cheek. The doctor treating his cheek suggested that he see an ophthalmologist as soon as possible, but he was not seen by such a specialist at UMMS that day. On October 30, 2018, Pendergrass was taken to Jessup Correctional Institution ("JCI") in Jessup, Maryland and examined by Dr. Bolaji Onabajo, who observed that he was experiencing worsening visual acuity in the left eye and blurry vision. Pendergrass was then referred to Dr. Amy Green-Simms, an ophthalmologist, who provided an initial ophthalmology consultation with Pendergrass at JCI on November 9, 2018. Pendergrass told her that he had poor vision in his right eye as a result of fighting. He recounted the July 15 injury to his left eye and told Dr. Green-Simms that "he was seen at UMMS and they told him his vision would not get better, and that it was a form of glaucoma." Green-Simms Decl. ¶ 4, Mot. Dismiss Ex. A, ECF No. 16-1. Dr. Green-Simms determined that out of his left eye, Pendergrass could see fingers counting at seven feet away. She measured Pendergrass's eye pressure, which was in the normal range for both eyes. Dr. Green-Simms noted that the "nerve which connects the eyeball to the brain," known as the "Disc," was abnormal because it was "a little thinner than average and was an indicator that the patient could have glaucoma." *Id*. Her assessment was a "history of trauma in both eyes and glaucoma suspected." *Id.* She referred Pendergrass to an optometrist to determine if his vision could be improved through corrective lenses. *Id*.

On December 7, 2018, Dr. Green-Simms conducted another eye examination on Pendergrass. On this occasion, Pendergrass told her that he was "legally blind" in his right eye, had been stabbed in the left eye, and was suspected of having glaucoma. Mot. Dismiss Ex. A-1 at

4, ECF No. 16-2.  A pressure test again resulted in normal readings.  Dr. Green-Simms performed a test to determine if Pendergrass's vision could be improved with glasses or corrective lenses, which involved the patient looking through a pinhole.  If the patient sees better through the pinhole, corrective lenses may improve the patient's visual acuity.  Pendergrass's vision, however, did not improve when looking through the pinhole.

Dr. Green-Simms also examined Pendergrass's cornea with a "20D lens," which led her to diagnose Pendergrass with "keratoconus, a progressive condition in which the cornea thins and begins bulging into a cone-like shape," which then "deflects light as it enters the eye" and "causes distorted vision."  Green-Simms Decl. ¶ 8.  Dr. Green-Simms advised Pendergrass to avoid rubbing his eyes and recommended that Pendergrass visit an optometrist to receive a fitting for rigid gas permeable ("RGP") lenses to treat the condition.

On January 1, 2019, Corizon replaced Wexford as the contract health care provider for the Maryland prisons.  Dr. Green-Simms, who is employed by Summerfield Eye Associates, which contracted with both Wexford and Corizon to provide ophthalmology services to inmates, remained available to treat Pendergrass.  On February 1, 2019, Dr. Green-Simms again saw Pendergrass, who reported worsening vision, especially in his left eye.  Pressure readings in both eyes remained in the normal range.  Where Pendergrass had not yet been fitted with RGP lenses, Dr. Green-Simms again recommended an optometry consultation for consideration of RGP lenses.  She noted that if the RGP lenses did not help, corneal transplant surgery should be considered.

When Dr. Green-Simms saw Pendergrass again on March 1, 2019 for a follow-up appointment, he again reported that his vision was worsening.  The pressure in his eyes remained normal,  and Pendergrass could see hand motions three feet away out of both eyes.  Dr. Green-Simms observed tiny lines in his cornea known as "Vogt Striae," a sign of keratoconus.  Green-

Simms Decl. ¶ 11. Dr. Green-Simms again referred Pendergrass to Optometry for an RGP lens fitting. Because reduction of swelling of the cornea can improve vision loss, Dr. Green-Simms recommended that Pendergrass use Muro saltwater eye drops to reduce surface swelling of the cornea. She also planned to refer Pendergrass to UMMS for an evaluation.

One week later, on March 8, 2019, Dr. Green-Simms submitted a consultation request for Pendergrass to go to the UMMS cornea clinic for an evaluation and fitting for RGP lenses. On March 26, 2019, she submitted an additional consultation request for Pendergrass to be seen at the Wilmer Eye Clinic at Johns Hopkins University for the same purposes. On April 5, 2019, Pendergrass was taken to the Wilmer Eye Clinic for an examination by Dr. Meraf Amde Wolle, an ophthalmologist, to address the keratoconus in both eyes. Pendergrass told Dr. Wolle that the vision in his right eye had been poor for 10 years and that he was legally blind in that eye. He also reported that after the 2018 assault, he had initially lost all vision in his left eye, that his vision returned to a certain degree, but that it had gradually worsened ever since.

During the examination, Dr. Wolle assessed Pendergrass with "[o]pen angle with borderline findings and low glaucoma risk in both eyes." Mot. Dismiss Ex. A-1 at 10. As part of that assessment, Dr. Wolle noted that Pendergrass had "large optic nerves with large CDR (cup-to-disc ratio)," which may imply glaucoma but is not necessarily indicative of that condition. *Id.*; Green-Simms Decl. ¶ 14. Pressure in both eyes was in the normal range. Dr. Wolle performed a Corneal Topography and Computerized Ophthalmic Imaging of the optic nerve of both eyes and diagnosed Pendergrass with keratoconus. Although noting that RGP lenses had been attempted but had not yet improved Pendergrass's vision, Dr. Wolle maintained that RGP lenses should correct the visual limitation caused by the keratoconus. Dr. Wolle also recommended

Cyclopentolate eye drops for his left eye. In light of the history of trauma and vision loss, Dr. Wolle also referred Pendergrass to Neuro-Ophthalmology for further evaluation.

On April 26, 2019, Dr. Green-Simms saw Pendergrass for a follow-up visit relating to his keratoconus. Pendergrass reported that he had tried RGP contact lenses, but they did not improve his vision. The pressure in his eyes remained normal. In accordance with Dr. Wolle's recommendation, Dr. Green-Simms submitted a consultation request for Pendergrass to be seen by Neuro-Ophthalmology at the Wilmer Eye Clinic. Also on April 26, 2019, Pendergrass received a new prescription for Cyclopentolate.

On May 31, 2019, Dr. Green-Simms saw Pendergrass for another follow up examination. At the time, Pendergrass had not yet had a Neuro-Ophthalmology consultation. Pendergrass reported that his eyes became irritated when he used Cyclopentolate, so Dr. Green-Simms discontinued the Cyclopentolate. This was the last time Dr. Green-Simms saw Pendergrass.

On July 18, 2019, Pendergrass had a Neuro-Ophthalmology consultation with Dr. Eric Singman at Johns Hopkins. After examining Pendergrass, Dr. Singman diagnosed Pendergrass with keratoconus and concluded that it was the main cause of his partial vision loss. Dr. Singman further concluded that Pendergrass had not suffered a traumatic optic neuropathy. He formally discontinued Pendergrass's Cyclopentolate prescription as unnecessary but continued the recommendation to use Muro eye drops.

## DISCUSSION

### I. Motion to Amend

One day after Defendants filed their Motion, Pendergrass filed a Motion to Add Dr. Green-Simms as a Defendant, which the Court construes as a Motion to Amend the Complaint. "A party may amend its pleading once as a matter of course . . . 21 days after service of a responsive pleading

or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). Because Pendergrass filed the Motion to Amend within 21 days after service of Defendants' Motion and had not sought to amend the Complaint before, it will be granted. For the reasons set forth below, however, Defendants' Motion will be granted as to Dr. Green-Simms.

## II.     Dispositive Motions

In their Motion, Defendants seek dismissal under Federal Rules of Civil Procedure 12(b)(6) or summary judgment under Rule 56. Specifically, Defendants argue that (1) Pendergrass's claim against them is based solely on a theory of vicarious liability which is not applicable to a claim under 42 U.S.C. § 1983; (2) Defendants are entitled to qualified immunity; (3) the medical records and other evidence in the record establish that Defendants and Dr. Green-Simms did not act with deliberate indifference to a serious medical need in violation of the Eighth Amendment; and (4) to the extent that Pendergrass has filed a medical negligence claim, he has not satisfied the applicable exhaustion requirements under Maryland law. For his part, Pendergrass seeks summary judgment in his favor.

### A.     Legal Standards

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the

factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

When deciding a motion to dismiss under Rule 12(b)(6), the Court considers only the complaint and any attached documents "integral to the complaint." *Sec'y of State for Def. v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Rule 12(d) requires courts to treat such a motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some notice that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment; and (2) the nonmoving party must be afforded "a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985).

Here, the notice requirement has been satisfied by the title of Defendants' Motion. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d) explaining why "for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d); *see Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244–45 (4th Cir. 2002). Pendergrass has not asserted that he needs additional discovery and instead submits his own exhibits and seeks summary judgment on his own behalf. Although he claims that certain medical records are missing, he has not explained why such records are necessary to resolve the pending motions. The Court therefore will construe Defendants' Motion as a Motion for Summary Judgment to the extent it relies on the submitted evidentiary materials.

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing such a motion, the Court views the facts in the light most favorable to the nonmoving party, "with all justifiable inferences" drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.*

### B.    Eighth Amendment

Pendergrass asserts that Defendants violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution because they did not provide adequate care for his vision problems arising from the July 2018 assault. The Eighth Amendment, which protects prisoners from "cruel and unusual punishments," U.S. Const. amend. VIII, prohibits "unnecessary and wanton infliction of pain" against inmates, *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). In order to state an Eighth Amendment claim arising from inadequate medical care, a plaintiff must demonstrate that the actions or omissions of the defendants exhibited deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106(1976). Such deliberate indifference requires proof that, objectively, the plaintiff was suffering from a serious medical need and that, subjectively, the

9

defendants were aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Objectively, the medical condition at issue must be serious. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (citation omitted). As for the subjective component, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* Thus, "[d]eliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto*, 841 F.3d at 225 (internal alterations omitted). Under this standard, a mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Id.* Moreover, if the requisite subjective knowledge is established, an official may avoid liability if the official "responded reasonably to the risk, even if the harm ultimately was not averted." *See Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

        **1.**    **Wexford and Corizon**

Pendergrass contends that he received inadequate medical treatment for his left eye injury that amounted to deliberate indifference to a serious medical need. In particular, he complains that

after the July 2018 injury, he had to wait over three months, until early November 2018, to receive specific treatment for his left eye that had deteriorating vision. [ECF 17-1 at 2] Since Wexford had the contract to provide medical care to Maryland inmates through the end of 2018, Pendergrass argues that Wexford "clearly neglected to schedule follow-ups that were mandatory after [he] was discharged from the hospital." Opp'n at 3. He points to his hospitalization in shock trauma as evidence that his condition was serious and the failure to send him back for follow-up appointments after his discharge as evidence of deliberate indifference by Wexford. Notably, MCTC acknowledged to Pendergrass, in a response to an administrative remedy procedure complaint ("ARP") appeal, that the failure to provide specific treatment during that time period was an error and that he should have been provided with follow-up care within two to three weeks of his injury. Opp'n Ex. 1 at 1. Although Pendergrass's August 2018 sick call request seeking treatment for his eye also did not result in a consultation with an eye specialist, where he was transferred from MCTC to DRCF on September 4, 2018, it is not clear that DRCF medical personnel were aware of his serious eye condition until he reported it during a September 27, 2018 medical visit. Then, after an October 18, 2018 visit to UMMS for other injuries sustained in the July 2018 assault during which a physician flagged his eye condition as requiring attention, he received an eye examination on October 30, 2018 and a consultation with an ophthalmologist on November 9, 2018.

Wexford and Corizon are private corporations that, at the time of the events in question, had contracts to provide health care to Maryland state prisoners. Entities such as Wexford and Corizon may be held liable under § 1983 only to the extent that they have a custom or policy that causes a violation of the Constitution or laws of the United States, such as a policy of deliberate indifference to serious medical needs. *See Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28

(4th Cir. 1999); *Monell v. Dep't of Soc. Servs. of the City of New York,* 436 U.S. 658, 690-91 (1978). Although the Court agrees with Pendergrass that Wexford did not act promptly in addressing his serious condition, and that Pendergrass endured an overly lengthy time period before he received eye-specific treatment, Pendergrass has not asserted that, and the record does not support a finding that, a particular custom or policy of either Wexford or Corizon resulted in a violation of his constitutional rights. Indeed, Pendergrass has characterized the failure to send him to follow-up visits at UMMS after the July 2018 incident as "a breakdown in communication," Opp'n at 8, resulting from his transfer from Brockbridge to MCTC immediately following that incident. The delay in treatment of Pendergrass's eye condition also appears to be partially related to his second transfer, from MCTC to DRCF, in September 2018. Thus, while Wexford should have addressed Pendergrass's eye condition more promptly, where there is no evidence of a custom and policy of unconstitutional treatment, Wexford and Corizon are entitled to dismissal of the constitutional claims against them. The Court therefore need not address their remaining arguments for dismissal.

### 2. Dr. Green-Simms

Dr. Green-Simms treated Pendergrass's eye condition from November 2018 to May 2019. Pendergrass assert that she did not provide him with "proper medication attention," Opp'n at 11, and that "nothing was being done" during the period when she was the primary medical provider for his eye condition, Opp'n Ex. 1 at 2. Among Pendergrass's specific complaints about Dr. Green-Simms is the assertion that during his first visit to her on November 9, 2018, she "was supposed to look in my medical records . . . so she would know I was diagnosed with left optic traumatic neurology," but she did not do so. Opp'n at 5. He further contends that after he told Dr. Green-Simms that he was supposed to be sent to UMMS for follow-up appointments, she did not facilitate

those visits, and that she should have independently concluded that he needed such care and made her own referrals. He asserts that during a visit on December 7, 2018, Dr. Green-Simms "acted as if she did not want to see" Pendergrass and did not actually conduct examinations of him. *Id.* Further, he also claims that Dr. Green-Simms misdiagnosed him with, and treated him for, glaucoma, which hindered his ability to receive treatment for the trauma to his eye.

There can be no question that Pendergrass suffered from an objectively serious condition that required medical treatment, specifically, the injury to his left eye. The evidence, however, does not support a finding that Dr. Green-Simms acted with deliberate indifference to that need. Dr. Green-Simms was first assigned to treat Pendergrass on November 9, 2018 and had additional medical visits with Pendergrass on December 7, 2018, February 1, 2019, and March 1, 2019. Over the course of those visits, Dr. Green-Simms examined Pendergrass, conducted tests such as pressure tests, the pinhole test, and the 20D lens examination, and diagnosed him with keratoconus. She recommended RGP lenses as treatment, as well as Muro saltwater eyedrops. When Pendergrass's condition worsened, on March 5, 2019 she requested a consultation with the Wilmer Eye Center at Johns Hopkins University, which occurred on April 5, 2019, during which Dr. Wolle reached the same diagnosis of keratoconus and recommended a Neuro-Ophthalmology consultation. Dr. Green-Simms requested that consultation after her next visit with Pendergrass on April 26, 2019 and examined him again on May 31, 2019. When the Neuro-Ophthalmology consultation occurred in July 2019, the doctor reaffirmed Dr. Green-Simms's diagnosis of keratoconus and concluded that the initial diagnosis in July 2018 of traumatic optic neuropathy was incorrect.

This course of treatment establishes that Dr. Green-Simms, far from ignoring Pendergrass's medical needs, conducted multiple examinations and evaluations of Pendergrass, made substantial

efforts to identify the source of his vision issues, and proposed a course of treatment consisting of the RGP lenses. Contrary to Pendergrass's claim, Dr. Green-Simms diagnosed him with keratoconus, not glaucoma, the same diagnosis reached by both Dr. Wolle and Dr. Singman. Although Pendergrass argues that Dr. Green-Simms should have sent him to specialists earlier, where those specialists reached the same diagnosis as Dr. Green-Simms, he has not shown how the failure to order earlier referrals was incorrect, much less deliberately indifferent. In any event, the fact that Pendergrass disagreed with Dr. Green-Simms's decisions on referrals and other treatment, and his claims that her proposed treatment was ineffective, does not establish deliberate indifference. *See Scinto*, 841 F.3d at 225. "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999); *see also Jackson*, 775 F.3d at 178 (describing the applicable standard as an "exacting" one). On the record before it, the Court finds that the evidence does not support a finding that Dr. Green-Simms was deliberately indifferent to Pendergrass's medical needs.

    **C.**    **Medical Malpractice**

Where Pendergrass asserts, at various times, that Defendants acted with "negligence" or engaged in "medical malpractice," Opp'n at 6, the Court construes the Complaint as also asserting a state law claim for negligence or medical malpractice. Such a claim, however, may be asserted only if Pendergrass can demonstrate that he first presented it to the Maryland Health Care Alternative Dispute Resolution Office. *See* Md. Code Ann., Cts. & Jud. Proc. §§ 3-2A-10 (West 2011); *Wilcox v. Orellano*, 115 A.3d 621, 625 (Md. 2015); *Rowland v. Patterson*, 882 F.2d 97, 99 (4th Cir. 1989) (holding that this requirement applies to medical malpractice claims filed in state

14

or federal court). Here, there is no basis to conclude that Pendergrass satisfied these requirements. Accordingly, Pendergrass's state law negligence or medical malpractice claim must be dismissed.

## CONCLUSION

For the foregoing reasons, Pendergrass's Motion to Amend the Complaint will be GRANTED, Defendants' Motion to Dismiss or Alternatively for Summary Judgment will be GRANTED, and Pendergrass's Motion for Summary Judgment will be DENIED. A separate Order shall issue.


Date:  August 6, 2020                    /s/ *Theodore D. Chuang*
                                        THEODORE D. CHUANG
                                        United States District Judge